UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **TEKINA JAMES** | **CIVIL ACTION** |
| **VERSUS** | |
| **CONNECTICUT GENERAL LIFE INSURANCE COMPANY, ET AL** | **NO. 07-799-B-M2** |

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 14 days from the date of service of this Notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report. The failure of a party to file written objections to the proposed findings, conclusions, and recommendation contained in a Magistrate Judge's Report and Recommendation within 14 days after being served with a copy of the Report shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge that have been accepted by the District Court.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in chambers in Baton Rouge, Louisiana, August 5, 2010.

**MAGISTRATE JUDGE CHRISTINE NOLAND**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| TEKINA JAMES | CIVIL ACTION |
| VERSUS | |
| CONNECTICUT GENERAL LIFE INSURANCE COMPANY, ET AL | NO. 07-799-B-M2 |

## MAGISTRATE JUDGE'S REPORT

This matter is before the Court on the cross motions on the merits of the above-referenced case filed by the plaintiff, Tekina James ("Mrs. James"), and the defendant, Connecticut General Life Insurance Company ("Connecticut General") (R. Docs. 22 and 21 respectively).  Connecticut General has filed a reply memorandum (R. Doc. 24) in response to Mrs. James' brief.

## FACTS & PROCEDURAL BACKGROUND

Mrs. James was hired by Administaff of Texas, Inc. ("Administaff") on June 26, 2005. On that date, she and her husband, Frank James ("Mr. James"), filled out a Voluntary Insurance Application to receive benefits through Administaff's group benefit plan.  *See*, Admin. Rec. p. 70-71.[1]  Such group benefit plan was underwritten by defendant, Connecticut General.  The parties to this matter have stipulated that the group benefit plan in question is governed by the Employee Retirement and Income Security Act ("ERISA").

In the first section of that application, wherein the employee provides his/her general identifying information, including his/her name, address, social security number, birthdate, gender, etc., the application specifically states the following:

---

[1] The administrative record in this matter is located at R. Doc. 12-1.

1

> ***Important:*** You must complete the medical questions in this application, if you apply: (1) for life insurance exceeding the Guaranteed Issue Amount, or (2) as a newly hired employee more than 30 days after you are eligible to elect benefits (for Life and Disability Insurance only). Such insurance will not take effect unless and until the insurance company has approved this medical questionnaire as satisfactory.

*See*, p. 70 of the Administrative Record. In the next section of the application, entitled "Complete if Electing Spouse/Domestic Partner Coverage," Mrs. James indicated that she was married at the time of her application and that she was electing to apply for coverage for her spouse, Mr. James. *Id.* In the third section of the application, entitled "Voluntary Group Universal Life Insurance," the applying insured is instructed to "See the brochure for Guaranteed Coverage, and the amounts of insurance you may purchase." *Id.*[2] Mrs. James

---

[2] The Administaff Voluntary Group Universal Life Insurance Plan and Connecticut General Amendment to Policy and Certificate provide the following concerning Guaranteed Coverage:

> **Guaranteed Issue Amount:** The face amount of coverage that an insured may purchase without satisfying the Insurability Requirement. The Guaranteed Issue Amount for each Class of Insureds is specified in The Schedule. We reserve the right to change this amount. *See*, Administaff plan, Adm. Rec. 94.
>
> **Guaranteed Issue Amount for Insured Spouse:** $20,000. *See*, Administaff plan, "The Schedule," Adm. Rec. 96; Connecticut General Amendment to Policy and Certificate dated January 1, 2004, Admin. Rec. 83.
>
> **Insured Spouse:**
>
> If coverage for a spouse is elected before or within 30 days after the date he becomes eligible, his insurance will become effective, in an amount not to exceed the Guaranteed Issue Amount, on the later of: (a) the date he becomes eligible; or (b) the date we receive the completed and signed enrollment form.
>
> If coverage for a spouse is elected for an amount in excess of the Guaranteed Issue Amount, he will become insured for the amount that exceeds the Guaranteed Issue Amount on the date we agree in writing to insure him for that amount. We will require the spouse to satisfy the Insurability Requirement before we agree to insure him for the higher amount.

2

checked the box marked "$100,000" for the "insurance amount for [her] spouse/domestic partner." *Id.*

The second page of the insurance application contained the medical questionnaire referenced above. At the top of that second page, the application states: "Complete Questions A-G if applying for life insurance above the Guaranteed Issue Amount. Complete Questions A-K if applying for life or disability insurance more than 30 days after you are eligible, or after your open enrollment period." *Id.*, p. 71. Mrs. James provided complete answers to Questions A, C, D, F, and G and to Question K for her husband. She did not provide any answers to Questions I and J. *Id.* Additionally, the answers to Questions B and E relating to her husband were "Yes." The medical questionnaire requested that, if a "Yes" answer was given to any of the medical questions, the applying insured should use the space below those questions (and an attached sheet, if needed) to "provide details" concerning the identified medical conditions. Question B asked if the proposed insured had been diagnosed with or received treatment for "[h]igh blood pressure, heart attack, pain or pressure in chest, shortness of breath, irregular heartbeats, heart murmur, varicose veins or any other disease or disorder of the circulatory system," and Question E asked if the proposed insured currently "use[d] prescribed medications." In the spaces below the medical questions, Mrs. James only indicated that Mr. James had the

---

If coverage for a spouse is elected more than 30 days after he becomes eligible, the spouse will become insured on the date we agree in writing to insure him. We will require the spouse to satisfy the Insurability Requirement before we agree to insure him for any amount. *See*, Administaff plan, Adm. Rec. 103.

*See*, Aministaff summary plan description and Connecticut General group insurance policy, Adm. Rec. 90-142.

condition of "asthma" and that the current status of that condition was "fine." No details whatsoever were given concerning the affirmative responses to Questions B and E as requested by the application. *Id.*

Mr. James died a year and three (3) months later, on September 24, 2006. Connecticut General representative, Natalie Hazen ("Ms. Hazen"), sent Mrs. James a letter dated September 29, 2006, which enclosed a claim form regarding Mr. James' death, requested a certified copy of his death certificate, and advised Mrs. James that insurance proceeds would be deposited in an account in Mrs. James' name. *See*, Adm. Rec. 222. The completed claim form and death certificate were received by Connecticut General on October 11, 2006. The death certificate indicated that Mr. James' death was caused by multiple organ failure, among other causes. Adm. Rec. 193-195. Connecticut General representative, Janet Bock ("Ms. Bock"), sent Mrs. James a letter on October 23, 2006, which advised that Mrs. James' claim for Group Universal Dependent Life Insurance had been approved in the amount of $20,000.88 and that, after deductions for funeral and cemetery expenses, the remaining amount was deposited into an account in Mrs. James' name. The letter informed Mrs. James that she should contact her employer's benefits department and review the insurance booklet or coverage certificate to determine whether she was eligible for any additional benefits. Adm. Rec. 187-188.

On January 3, 2007, Mrs. James' counsel, Kris Perret ("Mr. Perret"), sent a letter to Connecticut General, advising that Mrs. James had purchased an insurance policy for her husband in the amount of $100,000 on June 26, 2005 and that the premium amount for such insurance had been deducted from Mrs. James' paycheck. The letter contended that Mrs. James was entitled to an additional $80,000 in coverage under the policy and made

4

a formal demand that same be paid to her. Adm. Rec. 185. In response to that letter, Ms. Bock called Mr. Perret's office on January 5, 2007 and advised that Mrs. James only received $20,000 in insurance (*i.e.*, the guaranteed insurance amount) due to medical underwriting. Adm. Rec. 184.

In September 2007, Mrs. James filed a petition for damages in state court seeking the additional $80,000 in insurance benefits that she contends she is owed. The suit was removed to federal court on October 30, 2007. On March 12, 2008, this Court granted a Joint Motion to Continue Scheduling Conference and a stay of the case for administrative review, and the case was administratively closed.

On April 16, 2008, another Connecticut General representative, Colleen Bianco ("Ms. Bianco"), sent a letter to Mrs. James informing her that her claim for additional life insurance benefits was not payable. Adm. Rec. 176-179. The letter referred to the following provisions of the Administaff employee benefit plan and Connecticut General policy, contained in the section entitled "Effective Date of Insurance":

> If coverage for a spouse is elected before or within 30 days after the date he becomes eligible, his insurance will become effective, in an amount not to exceed the Guaranteed Issue Amount, on the later of (a) the date he becomes eligible; or (b) the date we receive the completed and signed enrollment form.
>
> If coverage for a spouse is elected for an amount in excess of the Guaranteed Issue amount, he will become insured for the amount that exceeds the Guaranteed Issue Amount on the date we agree in writing to insure him for that amount. We will require the spouse to satisfy the Insurability Requirement before we agree to insure him for the higher amount.

Adm. Rec. 177; 181. The letter advised Mrs. James that her coverage under the group policy and her husband's coverage up to the Guaranteed Issue Amount of $20,000 became

5

effective on October 12, 2005. Admin. Rec. 177. The letter informed her, however, that her spouse's coverage in excess of the $20,000 Guaranteed Issue Amount only became effective as long as he satisfied the insurability requirement. *Id.* Ms. Bianco's letter further advised Mrs. James that, because Questions B, E, J, and K on the medical questionnaire portion of the insurance application were incomplete as to Mr. James, the insurability requirement had not been met, and the additional $80,000 in benefits above the Guaranteed Issue Amount therefore was not payable. *Id.*, p. 178.

Ms. Bianco's letter stated that the Connecticut Lehigh Valley Service Center had sent a letter to Mrs. James on October 13, 2005 informing her of the above omissions in the medical questionnaire. *Id.*, p. 178. Ms. Bianco's letter also advised that the terms of the group policy in question required an insured spouse to satisfy the insurability requirement and to receive written approval from Connecticut General before an amount of insurance above the Guaranteed Issue Amount becomes effective. *Id.* According to Ms. Bianco, since Connecticut General did not receive the completed application, it was unable to determine whether Mr. James met the insurability requirements for an amount exceeding the Guaranteed Issue Amount. *Id.*

On June 13, 2008, Mr. Perret sent Connecticut General another letter, wherein he advised that "no additional information was ever requested [by Connecticut General] from Mr. or Mrs. James, nor were they ever informed that additional information was required." *See*, Admin. Rec. 175. The letter again demanded the additional $80,000 in benefits that Mrs. James contends she is owed and requested a formal appeal of Connecticut General's denial of additional benefits. *Id.*

On March 18, 2009, Connecticut General representative, Renee Worst ("Ms. Worst"), sent Mr. Perret a letter, wherein she advised that Connecticut General had performed another review of Mrs. James' claim that resulted in the same findings. Adm. Rec. 168-174. Specifically, the letter advised that, because the medical questions on the insurance application were not completely answered as to Mr. James, the insurability requirement was not satisfied and the amount of insurance coverage exceeding the $20,000 Guaranteed Issue Amount therefore was not payable. *Id.* That letter stated that Connecticut General's computer records and underwriting department indicate that its Lehigh Valley Service Center sent an omission letter to Mr. James on October 13, 2005. The Lehigh Valley Service Center's computer system contains a record called a "screen print," and according to Parisha Sabol ("Ms. Sabol"), the supervisor of medical underwriting, the "screen print" indicates that a letter dated October 13, 2005 was sent to Mr. James stating that his application for the $80,000 portion of the requested benefit amount had not been approved because the application contained omissions. According to Ms. Sabol, the omission letter requested that Mr. James provide details to medical questions B and E and that he needed to resign and redate the application. *See*, Exhibit 1 to Connecticut General's brief, Affidavit of Parisha Sabol; Adm. Rec. 169, 172-174. Connecticut General's computer system, however, has been unable to generate a copy of that alleged "omission letter." As such, there is not a copy of that letter in the administrative record. Connecticut General also searched its records and did not locate any response to that letter by Mr. or Mrs. James, and no additional information was ever provided in response to the questions on the medical questionnaire that were incomplete as to Mr. James.

Ms. Worst's March 18, 2009 letter explained that the policy in question provides that

7

an amount over the Guaranteed Issue Amount will only become effective when: (1) the insurability requirement is satisfied, and (2) Connecticut General agrees in writing to insure the eligible person. She advised that, because neither of those requirements were met as to Mr. James, the denial of Mrs. James' claim for additional benefits had been confirmed. Admin Rec. 169, 171.

In the application in question, Mrs. James indicated that she wished to have premiums paid by payroll and authorized her employer to deduct the necessary amounts from her earnings. Admin. Rec. 70. The administrative record also contains a note concerning the payment of those premiums, which is entitled "Premium clarification for file." Such note indicates that Connecticut General reviewed the payment history for premiums paid by Mrs. James. Such review indicates that Mrs. James was billed for and paid premiums based upon the Guaranteed Issue Amount of $20,000 in coverage for Mr. James and that she was never billed for and never paid premiums for $100,000 in coverage. Adm. Rec. 1.

Upon motion filed by Mrs. James, this case was reopened on August 13, 2009. An ERISA Case Order was subsequently issued on September 11, 2009. R. Doc. 11. Pursuant to that Order, the parties stipulated, as mentioned above, that the employee benefit plan at issue in this case is governed by ERISA. *See,* Joint Stipulation filed October 26, 2009, R. Doc. 13. Through other filings, the parties have also agreed that: (1) the ERISA plan in question grants discretionary authority to the administrator, Connecticut General, to determine eligibility for benefits and to interpret the terms of the

plan; (2) ERISA preempts all state law claims in this action; and (3) the administrative record is complete.  *See*, R. Docs. 12 and 15.

Since the parties have stipulated that all state law claims in this suit are preempted by ERISA, it is recommended that Mrs. James' claims for bad faith penalties pursuant to La. R.S. 22:656 should be dismissed with prejudice.[3]  *See, Cramer v. Association Life Insurance Company*, 569 So.2d 533 (La. 1990)(ERISA preempts claims for statutory penalties and attorneys' fees); *Gonzales v. Prudential Ins. Co. of America*, 901 F.2d 446 (5th Cir. 1990)(ERISA preempts all state law claims against self-funded employee disability benefits plans).  Thus, the only issue remaining before the Court is whether Mrs. James is entitled to the additional $80,000 in life insurance benefits under the ERISA plan in question.

## **LAW & ANALYSIS**

Under an ERISA plan, an administrator's denial of benefits is "reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," under which circumstances an abuse of discretion standard of review applies.  *Lain v. UNUM Life Ins. Co. of America*, 279 F.3d 337 (5th Cir. 2002); *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 599 (5th Cir. 1994)(The Fifth Circuit applies the abuse of discretion standard when reviewing factual determinations made by a plan administrator with discretionary

---

[3] Although plaintiff asserts arguments under theories of detrimental reliance and estoppel in her brief, such state law theories of recovery are preempted by ERISA.  *See, McNeil v. Time Ins. Co.*, 205 F.3d 179 (5th Cir. 2000)(Employee's claims against an insurance company for breach of contract, breach of the duty of good faith and fair dealing, negligent misrepresentation, common law discrimination, waiver, estoppel and ratification were preempted by ERISA, where each claim addressed an employee's right to receive benefits under the terms of an ERISA plan).

9

authority). Furthermore, a court's review of factual determinations under the abuse of discretion standard is limited to the administrative record, and a court may not open the record and conduct discovery as to these determinations. *Chapman v. Prudential Life Ins. Co. of America*, 267 F.Supp.2d 569 (E.D.La. 2003).

When applying the abuse of discretion standard to an administrator's factual determinations, the Court analyzes whether the administrator acted arbitrarily or capriciously. *Id.* A decision is arbitrary when made "without a rational connection between the known facts and the decision or between the facts and the evidence." *Id.* A plan administrator's decision will be affirmed if it is supported by "substantial evidence." *Id.* "Substantial evidence" is "more than a mere scintilla . . . [i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* A court may not substitute its judgment for that of the plan administrator. *Id.* The abuse of discretion standard exists to "ensure that administrative responsibility rests with those whose experience is daily and continual, not with judges whose exposure is episodic and occasional." *Id.*

While the abuse of discretion standard sets a "relatively high bar" for the plaintiff to overcome, the U.S. Fifth Circuit Court of Appeals applies a "sliding scale" standard of review in cases where the plan administrator is a "self-interested insurer" who serves as both the insurer and the administrator of the plan and stands to gain from a denial of the claim. *Id.*; *Vega v. National Life Ins. Servs., Inc.*, 188 F.3d 287, 287 (5th Cir. 1999)("The greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be"). In other words, the existence of a conflict is a factor to be considered in determining whether the administrator abused its discretion in denying

a claim, and the extent to which the scale slides depends upon the amount of evidence the plaintiff brings forward demonstrating a conflict of interest.  *Id.*  If there is no evidence of a conflict of interest or the only evidence is the fact that the plan administrator is also the insurer and has the authority to deny or approve claims, an administrator's decision is viewed only with "a modicum less deference" than the ordinary abuse of discretion standard.  *Id.; MacLachlan v. ExxonMobil Corp.*, 350 F.3d 472 (5th Cir. 2003)(Where only a "minimal basis for a conflict" is established, "only a modicum less deference" than the ordinary abuse of discretion standard is applied).[4]  Under that standard, the basis for the administrator's decision must be supported by "some concrete evidence in the administrative record."  *Vega*, 188 F.3d at 302; *Robinson*, at 395.

In the present case, the only evidence before the Court of a conflict of interest is the fact that Connecticut General is both the plan administrator that makes decisions concerning the granting or denial of benefits and the insurer.  As such, Connecticut General's decision should be reviewed under an arbitrary and capricious standard and with only a "modicum of less deference" as a result of the conflict.  Thus, considering the legal standards set forth above, this Court should uphold Connecticut General's decision denying the additional $80,000 in benefits if that denial is based upon "substantial evidence" or more than a scintilla but less than a preponderance of the evidence.

Applying that standard, the undersigned finds that Connecticut General's decision should be upheld.  The concrete evidence in the administrative record upon which such

---

[4] In reality, even with this reduced abuse of discretion standard of review, a plaintiff is not in a much better position to defeat the administrator's findings since it is difficult to prove a conflict of interest beyond the inherent conflict of the "self-interested insurer" when the Court is confined to the evidence in the administrative record.  *Id.*

11

decision is based is the language of the insurance application itself in conjunction with the language of the Administaff plan and Connecticut General group insurance policy. As noted above, the insurance application specifically advises the applying insured, in the first section of the application, to "complete the medical questions in this application, if you apply: (1) for life insurance exceeding the Guaranteed Issue Amount" and that "such insurance [*i.e.*, insurance exceeding the Guaranteed Issue Amount] will not take effect unless and until the insurance company has approved this medical questionnaire as satisfactory." That language makes it clear that, unless the applying insured provides complete answers to all of the applicable questions in the medical questionnaire and Connecticut General approves the applying insured and his/her spouse for insurance, insurance coverage in excess of the Guaranteed Issue Amount will not take effect. The Administaff plan and the group insurance policy itself further define what the "Guaranteed Issue Amount" is and the amount thereof – that being $20,000. The insurance application specifically instructed Mr. and Mrs. James to review the brochure concerning Guaranteed Coverage, and the amounts of insurance that they may purchase. As such, Mr. and Mrs. James were made fully aware, at the time that they applied for insurance, that the applicable questions of the medical questionnaire had to be completed before insurance exceeding the Guaranteed Issue Amount would become effective. Despite such knowledge, certain of the medical questions pertaining to Mr. James were not completed in accordance with the instructions on the application. Connecticut General therefore had sufficient basis to deny the additional benefits exceeding the Guaranteed Issue Amount of $20,000. Furthermore, the other requirement that needed to be met in order for the additional benefits exceeding the Guaranteed Issue Amount to become effective was not

satisfied – because Mr. and Mrs. James never completed the medical questionnaire as to Mr. James, he never met the insurability requirement, and Connecticut General therefore never agreed in writing to insure him for an amount exceeding the Guaranteed Issue Amount.

In opposing the above evidence in the administrative record, which supports Connecticut General's decision, plaintiff has set forth several arguments, none of which are convincing to the Court.  First, plaintiff argues that, because there is a horizontal line dividing the first section of the application (wherein the applying insured supplies identifying information about himself/herself and wherein there is a notice instructing the applying insured that the medical questions in the application must be completed if he or she is applying for life insurance exceeding the "Guaranteed Issue Amount") from the second section of the application (wherein the identifying information of the spouse or domestic partner of the insured is supplied), the requirement concerning completion of the medical questionnaire does not apply to the spouse or domestic partner sought to be covered under the policy.  That argument simply does not make sense.  There is no indication in the notice concerning the medical questionnaire that only the employee applying for insurance must complete the medical questionnaire and not his/her spouse or domestic partner.  Although the notice refers to "you," meaning the applying employee, it does so because it is the employee that applies for insurance on behalf of himself/herself and on behalf his/her spouse or domestic partner. The reference to "you" does not mean that only the employee is required to supply answers to the medical questions which impact insurability determinations.   It is only rational that an insurance company would want to review information concerning the medical history and conditions of an applying insured, whether

13

it be the employee or the employee's spouse/domestic partner, before determining whether such individual is insurable in an amount exceeding the Guaranteed Issue Amount.

Moreover, the medical questionnaire portion of the insurance application actually has a specific column for the employee's spouse/domestic partner, wherein information is to be supplied in response to questions concerning that individual's medical history/conditions. Considering that the spouse/domestic partner is specifically listed in the medical questionnaire, plaintiff's argument that only the employee is required to answer the medical questionnaire as it relates to him/her lacks any validity.

Additionally, plaintiff argues that Connecticut General's decision denying benefits was arbitrary and capricious because it never requested any additional information from Mr. and Mrs. James following the submission of their insurance application. This fact is disputed. Although Connecticut General cannot produce a copy of the alleged "omission letter" dated October 13, 2005 (wherein it allegedly advised Mr. James that he had failed to complete certain of the required medical questions and that he needed to supply the omitted information and resign and redate the application), Connecticut General has supplied the affidavit of Ms. Sabol and a copy of the "screen print" from the computer system, which indicate that a letter was sent to Mr. and/or Mrs. James on October 13, 2005 stating the above information. Regardless, the undersigned does not find that Connecticut General was required to request additional information from Mr. James in order for it to have sufficient basis to deny coverage in excess of the Guaranteed Issue Amount. The application and plan language themselves, which Mr. and Mrs. James should have read at the time they applied for the insurance in question, specifically advised that the medical questions must be completed and that insurability had to be approved in writing by

14

Connecticut General in order for coverage in excess of the Guaranteed Issue Amount to become effective. The plaintiff has not referred the Court to any requirement that Connecticut General follow up to obtain information if an applying insured failed to supply all of the required information in an insurance application.

Finally, plaintiff relies upon Ms. Bianco's April 16, 2008 letter to Mrs. James, as evidence that Connecticut General has "admitted" that the Guaranteed Issue Amount in this case is $80,000, instead of $20,000. Specifically, she refers to the following paragraph of that letter, wherein Ms. Bianco stated:

> Regrettably, I must decline the additional amount elected **above the Guaranteed Issue Amount of $80,000.00** under policy number L104500.

[Emphasis added]. The undersigned's review of Ms. Bianco's letter in its entirety, however, indicates that the above-quoted excerpt was likely a grammatical or typographical error on her part, as it is apparent from the rest of the letter (and other evidence in the administrative record) that it is Connecticut General's position that the Guaranteed Issue Amount owed to Mrs. James was $20,000. For example, in the "Summary of the Evidence" section on page 2 of Ms. Bianco's letter, she specifically states that "[s]pouse life insurance coverage elected in excess of the **$20,000 Guaranteed Issue Amount** would become effective as long as [Mr. James] satisfied the Insurability requirement." [Emphasis added]. Ms. Bianco again states in the last paragraph on Page 2 of her letter that, the "coverage for the **Guaranteed Issue amount of $20,000** went into effect on October 12, 2005. The **additional $80,000 was pending medical underwriting**." [Emphasis added]. Considering those other statements in Ms. Bianco's letter and the fact that the plan itself specifically states that the Guaranteed Issue Amount is $20,000, the undersigned cannot find that the

15

isolated, and likely erroneous,[5] reference to the Guaranteed Issue Amount as $80,000 in Ms. Bianco's letter is sufficient evidence to constitute an admission on the part of Connecticut General that $80,000 is the Guaranteed Issue Amount and that its decision denying additional benefits was therefore an abuse of its discretion.  The undersigned also notes that, although insurance premiums were deducted from Mrs. James' earnings as she requested in her insurance application, evidence in the administrative record indicates that such premiums were only based upon the Guaranteed Issue Amount of $20,000; thus, plaintiff's argument that she is entitled to the additional $80,000 in benefits because she paid premiums based upon that amount also lacks merit.  *See*, Adm. Rec. 1.  Accordingly, because there is more than a scintilla of evidence in the record supporting Connecticut General's decision denying the additional benefits claimed herein, Mrs. James' present complaint should be dismissed with prejudice.

---

[5] The undersigned finds that the statement from Ms. Bianco's letter upon which Mrs. James relies has a misplaced prepositional phrase, which results in confusion as to which words the phrase modifies.  Specifically, as it is presently written, the prepositional phrase, "of $80,000," modifies the terms, "the Guaranteed Issue Amount," and results in confusion.  To be grammatically correct, the sentence should have stated the following:

> Regrettably, I must decline the additional amount **of $80,000** elected above the Guaranteed Issue Amount under policy number L104500.

In that corrected version of the sentence, the phrase, "of $80,000," properly modifies the terms, "the additional amount," which, when the remainder of the letter is considered, is clearly what Ms. Bianco intended to state.

**RECOMMENDATION**

For the above reasons, the present suit should be **DISMISSED WITH PREJUDICE**.

Signed in chambers in Baton Rouge, Louisiana,  August 5, 2010.

*[signature]*

**MAGISTRATE JUDGE CHRISTINE NOLAND**